UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES,

v.

PETER BRAND and
JIE "JACK" ZHAO,

Defendants.

Case No. 1:20-cr-10306-GAO

**MEMORANDUM OF LAW OF JOSHUA MILLER IN SUPPORT OF MOTION TO QUASH TRIAL SUBPOENA OR FOR A PROTECTIVE ORDER**

Joshua Miller ("Miller"), a non-party subpoenaed witness, submits this memorandum of law in support of his motion to quash the trial subpoena served on him by the government or for a protective order.

## INTRODUCTION

On April 4, 2019, the Boston Globe published an online article written by Miller headlined "He bought the fencing coach's house. Then his son got into Harvard" (the "Article"). See **Exhibit B** to Declaration of Joshua Miller ("Miller Dec."). The Article contained statements made by Defendant Jie "Jack" Zhao during an April 2, 2019, interview conducted by Miller at the Hilton Boston Logan Airport. The interview was recorded with Zhao's consent. Miller Dec. ¶ 3. In November 2020, some 19 months after the Article, the government charged Zhao and Brand with engaging in a scheme in which Zhao allegedly made various payments to and for the

benefit of Brand as bribes, in exchange for Brand's facilitating the admission of Zhao's sons to Harvard as recruited fencers.[1]

Miller respectfully requests that the subpoena be quashed on the grounds that his testimony is not central to or essential to the government's case. The government has charged and proceeded with this case based on its own ample investigatory powers. Miller's testimony would be largely redundant of the documentary evidence and testimony already obtained by the government, including the anticipated testimony Alex Ryjik, a cooperating witness who has personal knowledge of the transactions at issue. Should the Court find that the government has carried its burden of demonstrating that Miller's First Amendment interests are outweighed by the government's interest in obtaining statements made by Zhao, Miller requests that the Court follow the procedure endorsed by the First Circuit in United States v. LaRouche Campaign, 841 F.2d 1176, 1182 (1st Cir. 1988) and review the interview recording *in camera* to determine whether and to what extent Zhao's statements are relevant and admissible. If the Court finds that any portion of the recording is admissible, Miller's testimony still would be unnecessary because the recording may be admitted by lay witnesses familiar with Zhao's voice, including but not limited to cooperating witness Ryjik. See Fed. R. Evid. 901(b)(5); United States v. Panico, 435 F.3d 47 (1st Cir. 2005); United States v. Garcia-Alvarez, 541 F.3d 8 (1st Cir. 2008).

## STATEMENT OF FACTS

### A. Summary of the Evidence Obtained by the Government

Court filings summarize extensive evidence obtained by the government in support of its charges. See, e.g., n.1, supra. The principal purpose of the alleged conspiracy, according to the

[1] See ECF No. 172 at 1 (Joint Pre-Trial Memorandum; *see also* ECF No. 3-1 (affidavit of special agent Elizabeth Keating in support of criminal complaint); ECF No. 56 (Superseding Indictment ("Indictment" or "S.I.")).

government, was for Brand to facilitate the admission of Zhao's sons to Harvard in exchange for bribes totaling more than $1.5 million. S.I. ¶¶ 7, 8(b). Cooperating witness Ryjik allegedly aided the plan by communicating with Brand on behalf of Zhao. Id. ¶¶ 10-12, 15-18; ECF No. 172 at 2 (identifying Ryjik as the cooperating witness). The information Ryjik provided "has been corroborated by other evidence, including documents, emails, and text messages." ECF no. 3-1 at page 5 n.2. Ryjik is on the government's witness list. ECF No. 172 at 8.

### 1. The Government's Evidence of Communications Concerning the Admission of Zhao's Older Son

On or about May 2, 2012, Brand allegedly sent the following text message to Ryjik: "Jack doesn't need to take me anywhere and his boys don't have to be great fencers. All I need is a good incentive to recruit them[.] You can tell him that[.]" S.I. ¶ 10. Two months later, Ryjik texted Brand asking: "Is there space for[...] your favorite Chinese supporter?" Brand replied: "Of course as long as Z[h]ao cones [sic] through with the financial support[.]" Brand added: "He is my no 1 recruit as long as my future us [sic] secured." Id. ¶ 11. Later that month, Brand texted Ryjik to inquire whether he had "spoken to Zhao yet." Ryjik responded: "Off [sic] course call me when u can[.]" Id. ¶ 12.

In October 2013, Brand texted Ryjik saying, "I can use the donation to the foundation after tomorrow." Id. ¶ 14. The following day, after receiving an email informing him that Harvard had deemed the admission of Zhao's son as "likely," Brand texted the confidential informant: "Your man is good to go. Don't say anything to him until he receives the call from admissions." Id. ¶ 16. In December 2013, Zhao emailed Brand an acceptance letter that Zhao's son had received from Harvard that day. Zhao wrote: "Hi Boss...It is official now. I just want to thank you for what you did, really appreciate." Id. ¶ 18.

### 2. The Government's Evidence of Payments Made by Zhao

In February 2013, Zhao contributed approximately $1 million to Ryjik's fencing charity as a "purported donation[.]" Id. ¶ 13. In October 2014, shortly after Zhao's son began studies at



DB3/ 204387657.1

Harvard, the fencing charity contributed $100,000 to the Peter Brand Foundation. The payment was funded by Zhao's $1 million dollar contribution. Id. ¶¶ 14, 19.

In June and July 2015, Zhao wrote two checks to Penn State University in the total amount of $8,428.66 to pay for Brand's son's tuition. Id. ¶ 20. He also (a) wrote a check to the U.S. Department of Education in the amount of $32,339.92, to pay Brand's son's educational loans, id. ¶ 21; (b) made payments totaling $119,051.52 to pay off the mortgage on Brand's home in Needham, Massachusetts, id. ¶ 22; (c) paid $2,573.45 to pay the Needham water and sewer bill for Brand's home and $34,563.25 to GM Financial to pay Brand's car loan, id. ¶¶ 23-24; and (d) paid $50,000 into an escrow account for Brand's purchase of a condominium in Cambridge, Massachusetts, id. ¶ 25. In May 2016, Zhao bought Brand's Needham home for $989,500, "well above its assessed value." Id. ¶ 26. Brand used the sales proceeds to fund his purchase of the Cambridge condominium. Id.

### 3. The Government's Evidence Concerning the Admission of Zhao's Younger Son

In June 2016, Brand emailed an Associate Director of Harvard Athletics, stating that he had offered recruiting slots to Zhao's younger son and four other prospective students. Id. ¶ 27. Brand later emailed Zhao's son to inform him he should send in a completed application by September 15 in order to be considered for a "likely" letter. Id. ¶ 28. Zhao's son received the "likely" letter in September 2016. Id. ¶ 29. Between August 2016 and April 2017—"during the period in which Zhao's son's Harvard application was pending"—Zhao paid a Massachusetts-based residential construction company at least $154,626.41 for renovations to Brand's Cambridge condominium. Id. ¶ 30.

## B. Miller's Boston Globe Article

The Article reported that the Globe interviewed Zhao at the Hilton Boston Logan Airport after flying from Virginia to Boston "because he wanted to explain everything in person, and, in his words, look the reporter in the eye." Miller Dec., **Exhibit B** at 2. With Zhao's consent,

Miller recorded the Logan Airport interview, which is approximately 50 minutes long. Id. ¶ 3. The Article attributed the following quoted statements to Zhao from the interview:

- [Referring to Defendant Brand:] "We have a freshman weekend or whatever that we went to the fencing room, sit down, talk with him[.] . . . The more we talk, I really like this guy."
- "He did not ask me, 'Jack, can you buy me a house?' No. No. No. That is just not the situation[.]"
- "From my perspective, I'm just making his life better plus making a good investment[.]"
- [Referring to Brand's house:] "pretty cozy[.]"
- "You can ask me why didn't you check the market value of the house? I did not because I trust him[.] . . . He gave me the price. . . . I said, 'fine.'"
- "[W]hy would I use my own name" [on the real estate documents if he had seen a conflict with the admissions process and the purchase].
- "If I know the policies that the coach cannot sell to students or parents of student, I would not do it. I have no idea, right? I don't think there's any violation or anything[.]"
- [Referring to his instructions to a real estate agent in 2017:] "I told him: Sell the first one who gives the offer!"
- "Nerdy boys and we want them to be athletes, right?"
- "You know, I am the only one flying people business class to those because I pay big respect to the coaches[.]"
- "[Alex Ryjik] always introduced the parents to Brand[.]"

## ARGUMENT

### A. The First Amendment and Federal Common Law Protect the Press from Compelled Disclosure of Newsgathering Information and Materials.

In order to "enable members of society to cope with the exigencies of their period," the Amendment necessarily provides structural protections for all of the activities needed to gather and disseminate information to the public. See Thornhill v. Alabama, 310 U.S. 88, 102 (1940). See generally Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 576 (1980) ("[w]ithout

some protection for seeking out the news, freedom of the press could be eviscerated."). Thus, "[t]he press is not only shielded when its speaks out, but when it performs all the myriad tasks necessary for it to gather and disseminate the news." Brennan, Address, 32 Rutgers L. Rev. 173, 177 (1979).

These principles have led to the widespread recognition that the First Amendment protects journalists from the needless disclosure of sources, investigative techniques, and both confidential and non-confidential work product. "Courts afford journalists a measure of protection from discovery initiatives in order not to undermine their ability to gather and disseminate information. [Citation omitted]. Journalists are the personification of a free press, and to withhold such protection would invite a 'chilling effect on speech,' ... and destabilize the First Amendment." In re Cusumano, 162 F.3d 708, 714 (1st Cir. 1998). See also United States v. LaRouche Campaign, 841 F.2d 1176, 1182 (routine compulsion of even non-confidential information threatens First Amendment interests). See generally Branzburg v. Hayes, 408 U.S. 665, 710 (1972) (Powell, J. concurring); Bruno & Stillman, Inc. v. Globe Newspaper Co., 633 F.2d 583, 598-99 (1st Cir. 1980).[2]

In Cusumano, for example, the First Circuit affirmed a trial court order quashing the subpoenas of two academic authors in the United States' antitrust case against Microsoft. After learning that two authors were writing a book in which employees of a Microsoft competitor were quoted as attributing their company's economic problems to "self-inflicted wounds" rather than to anti-competitive behavior, Microsoft subpoenaed the author's manuscript and underlying interview notes and tape recordings. Reviewing the trial court's order quashing the subpoena, the First Circuit found that Microsoft's need for the subpoenaed materials "admittedly is

---

[2] See also Shoen v. Shoen, 48 F.3d 412, 418 (9th Cir. 1995) and Gonzales v. National Broadcasting Co., Inc., 194 F.3d 29, 30 (2d Cir. 1999)("Shoen II") (First Amendment protects against unnecessary discovery of even non-confidential journalistic work product).

substantial in the sense that relevant information likely exists" concerning the company's "primary defense." 162 F.3d at 716. Nevertheless, because Microsoft could have obtained the same information by direct discovery of the persons interviewed by the authors, and in view of the fact that forced disclosure would harm the author's future research efforts, as well as those of other similarly situated authors, the First Circuit held that the trial court "acted well within its discretion" in denying the discovery. 162 F.3d at 717. See also In re Request from the United Kingdom Pursuant to the Treaty, 718 F.3d 13, 24 (1st Cir. 2013) ("A balancing of First Amendment concerns vis-à-vis the concerns asserted in favor of the compelled disclosure of academic and journalistic information is the law in this circuit for all First Amendment cases and, as explained in our analysis above, 'at least in situations distinct from Branzburg [i.e., grand jury subpoenas],' there is room for courts to require direct relevance.").

In LaRouche, the First Circuit recognized that routinely requiring journalists to produce "outtakes, notes, and other unused information, even if non-confidential" threatens at least four legitimate newsgathering interests: (1) "the risk of "'judicial intrusion' into the newsgathering . . . process"; (2) "the disadvantage of a journalist appearing to be . . . a research tool of government"; (3) creating a "disincentive to 'compile and preserve non-broadcast material'"; and (4) "the burden on journalists' time and resources in responding to subpoenas." 841 F.2d at 1182 (emphasis added). In the Court's words:

> To the extent that compelled disclosure becomes commonplace, it seems likely indeed that internal policies of destruction of materials may be devised and choices as to subject matter made, which could be keyed to avoiding disclosure requests or compliance therewith rather than to the basic function of providing news and comment. In addition, frequency of subpoenas would not only preempt the otherwise productive time of journalists and other employees, but measurably increase expenditures for legal fees.

Id. See also id. ("Finally, observing Justice Powell's essential concurring opinion in Branzburg, 'certainly, we do not hold . . . that state and federal authorities are free to annex the news media as an investigative arm of government.'") (citation and some internal quotation marks omitted).

The LaRouche Court also endorsed "sensitive district court conduct of in camera reviews to respond to the generalized First Amendment concerns that would be triggered by too easy and routine a resort to compelled disclosure of nonconfidential material." Id. at 1183. In camera review, the Court noted, would allow district courts "to balance the competing constitutional interests, limiting disclosure of journalistic products to those cases where their use would, in fact, be of significant utility." Id. (citing United States v. Burke, 700 F.2d 70, 78 n. 9 (2d Cir. 1983) ("We encourage the courts to inspect potentially sensitive documents, especially in situations where, as here, the record reveals that the [media's] work papers were not sufficiently voluminous to render in camera review impracticable.")).[3]

The Department of Justice recognized similar principles in its recently amended "Policy regarding obtaining information from, or records of, members of the news media; and regarding questioning, arresting, or charging members of the news media." See **Exhibit A** hereto. The Policy declares that "the use of compulsory legal process to seek information from or records of non-consenting members of the news media constitutes an extraordinary measure, not a standard investigatory practice." Id. at 5. Other than in circumstances not present here, the Department may only use compulsory process for the purpose of obtaining information from or records of a member of the news media "acting within the scope of newsgathering" to "authenticate for evidentiary purposes information or records that have already been published, in which case the authorization of a Deputy Assistant Attorney General for the Criminal Division is required[.]" Id. at 9.[4] The Policy also requires the official authorizing compulsory legal process to find that

---

[3] See also United States v. Shay, No. 92–10369–RWZ, 1993 WL 263493, *2 (D. Mass. 1993) (ordering in camera review of news outtakes pursuant to LaRouche).

[4] The Policy permits the use of compulsory process in cases where the news media consents or when necessary to prevent imminent or concrete risk of death or serious injury, or incapacitation or destruction of critical infrastructure. Id.

(a) the government has exhausted all reasonable alternative, non-media sources for the information; (b) the subpoena is "narrowly drawn," directed at "material and relevant information regarding a limited subject matter"; and (c) "avoid[s] interference with unrelated newsgathering[.]" Id. at 12.

The balancing process required in considering a motion to quash a subpoena of a journalist thus includes consideration of the following factors:

1. Whether the party seeking disclosure has met its burden of demonstrating that the information sought is truly relevant, and that its request is not a "fishing expedition." Bruno & Stillman, 633 F.2d at 597; Cusumano, 162 F.3d at 716.

2. If the party seeking disclosure meets its initial burden, the court next considers whether the objecting party has shown a basis for withholding the information, as for example, by demonstrating either a reasonable expectation of harm that would result from disclosure. Bruno & Stillman, 633 F.2d at 597; Cusumano, 162 F.3d at 716. See also Larouche, 841 F.2d at 1182. See generally Herbert v. Lando, 441 U.S. 153, 174 (1979).

3. Finally, the court considers whether the asserted interest in disclosure outweighs the resulting harm to the free flow of information and whether the competing interests may be accommodated by measures such as requiring the exhaustion of alternative sources. Bruno & Stillman, 633 F.2d at 597-98; Cusumano, 162 F.3d at 716-17; United Kingdom, 718 F.3d at 24.

"While obviously the discretion of the trial judge has wide scope, it is a discretion informed by an awareness of First Amendment values and the precedential effect which decision in any one case would be likely to have." Bruno & Stillman, 633 F.2d at 598. Where, as here, testimony is sought from a non-party witness, "concern for the unwarranted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs." Cusumano, 162 F.3d at 717. "Mindful that important First Amendment values are at stake," id. at 710, "detailed findings of fact and explanation of the decision would be appropriate." Bruno & Stillman, 633 F.2d at 598.

**B. The First Amendment Interests in Avoiding the Compelled Testimony of Reporters Outweighs the Interest in Miller's Testimony.**

As the First Circuit recognized in LaRouche, a non-party such as Miller may be at a disadvantage in attempting to address the specific evidentiary arguments in a case to which it is a stranger. 841 F.2d at 1183. That does not relieve the government of demonstrating that the testimony it seeks from a reporter is directly relevant, not cumulative of other evidence in the case, and cannot be obtained from another witness (such as Ryjik). For example, Miller has no unique evidence about the payments made by Zhao (which presumably may be proven by financial records) or communications (both oral and electronic) between Zhao, Ryjik, and Brand. See ECF No. 3-1 at 14, ¶ 61 (describing meeting between Zhao and Ryjik shortly after publication of Globe Article); see generally Cusumano, 612 F.3d at 716-717 (interests of non-party witnesses are entitled to "special weight" and existence of alternative sources favors non-disclosure by the press). Nor is the subpoena, but its terms, limited to "authentic[ating] for evidentiary purposes information or records that have already been published." See Exhibit A at 8.[5]

---

[5] Judge Rakoff's decision in United States v. Treacy, 603 F. Supp. 2d 670 (S.D.N.Y. 2009), cited by the government in the parties' joint pre-trial memorandum, does not dictate a contrary result. ECF No. 172 at 4. Treacy recognized that the protection for journalists "applies to both confidential and non-confidential information, as well as to both published and unpublished information." Id. at 672 (citations omitted). After considering the relevance of the information sought and the ability to obtain the information from another source, the court narrowly circumscribed the permissible areas of inquiry. Id. at 673. The fact-intensive nature of the inquiry was emphasized in a subsequent decision by Judge Rakoff granting a motion to quash a subpoena of a reporter for published information concerning the circumstances of an arrest. See Lebowitz v. City of New York, 948 F.Supp.2d 392, 394-95 (S.D.N.Y. 2013). As Judge Rakoff stated: "the reporter's privilege stems from a desire to protect journalists from being regularly subpoenaed, and thus from being transformed, in effect, into the investigative agents of courts and litigants." Id. at 395. "That rationale applies with equal force to information gleaned from personal observations as to information obtained from interviews or other newsgathering activities." Id.

Should the Court decide that the statements made by Zhao to Miller are directly relevant and neither cumulative nor readily available from other sources, Miller respectfully requests that, as in LaRouche, the Court conduct an in camera review of the recorded interview in order to "to balance the competing constitutional interests, limiting disclosure of journalistic products to those cases where their use would, in fact, be of significant utility." 841 F.3d at 1183.

If the in camera review establishes that any of Zhao's statements on the recording are admissible and grants the parties access to those portions of the recording, Miller's testimony still would not be needed. The Federal Rules of Evidence permit authentication of a tape recording by any lay witness who is familiar with the speaker's voice. Fed. R. Evid. 901 provides:

> (a) In General. To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.
>
> (b) Examples. The following are examples only--not a complete list--of evidence that satisfies the requirement:
>
> ***
>
> (5) Opinion About a Voice. An opinion identifying a person's voice--whether heard firsthand or through mechanical or electronic transmission or recording--based on hearing the voice at any time under circumstances that connect it with the alleged speaker.

Fed. R. Civ. P. 901 (a) and (b)(5). As the Advisory Committee Notes explain: "Since aural voice identification is not a subject of expert testimony, the requisite familiarity may be acquired either before or after the particular speaking which is the subject of the identification, in this respect resembling visual identification of a person rather than identification of handwriting." Id., Advisory Committee Notes, Example 5.

In Panico, for example, two state troopers identified a voice on a telephone recording as the defendant. 435 F.3d 47. The Court concluded that lay witness identification, "based on a witness's prior familiarity with a voice, is a common place way in which voices are identified." Id. at 49 (citing Fed. R. Evid. 901(b)(5) and Weinstein's Federal Evidence, § 901.06[1]). "It is not enough to bar an identification, either of voices or faces, that the procedures were

'suggestive'' it must also be shown that, under the 'totality of the circumstances,' the identification was 'unreliable.'" Id. (emphasis in original) (citations omitted). See also Garcia-Alvarez, 541 F.3d at 14-15 (upholding identification based on lineup and having the defendant repeat an alleged threat, despite that defendant was the only person in the lineup who had a Dominican accent as described by victim).

In this case, assuming that Zhao does not stipulate to the recording, Rule 901 authorizes Ryjik to authenticate the statements made by Zhao on the recording. The record shows that Ryjik, who was the high school fencing coach for Zhao's two sons, has had numerous communications with Zhao over the years. See, e.g., ECF No. 3-1 at 14, ¶ 61 (describing a meeting between Zhao and Ryjik shortly after the Article was published); see also id. at 3, 6, 7. There may be other government witnesses familiar with Zhao's voice who also can authenticate the recording. In all events, there should be no need for Miller to testify even if the Court deems any statements on the recording relevant and admissible.

## CONCLUSION

For the foregoing reasons, Joshua Miller respectfully requests that his motion to quash trial subpoena be granted or, in the alternative, a protective order issue providing for an in camera review of the recording of Miller's interview and, should the Court determine that the recording contains relevant, non-cumulative evidence, further providing that the recording should be authenticated by a witness or witnesses other than Miller.

**JOSHUA MILLER,**

By his attorneys,

*/s/ Jonathan M. Albano*
Jonathan M. Albano, Bar No. 013850
jonathan.albano@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Federal Street
Boston, MA 02110-1726
Telephone: +1.617.341.7700
Facsimile: +1.617.341.7701

Dated: November 3, 2022

**CERTIFICATE OF SERVICE**

I, Jonathan M. Albano, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on November 3, 2022.

*/s/Jonathan M. Albano*
Jonathan M. Albano